**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARLA MCLAURIN,

          *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant*.

_____/

CASE NO. 15-13912

DISTRICT JUDGE GERALD E. ROSEN

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 19, 20)

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that McLaurin is not disabled. Accordingly, **IT IS RECOMMENDED** that McLaurin's Motion for Summary Judgment (Doc. 19) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 20) be **GRANTED**, and that this case be **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401 *et seq*. (Doc.

4; Tr. 1-3), and Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 19, 20).

Plaintiff Marla McLaurin was forty-eight years old as of April 18, 2014, the date of the ALJ's decision. (Tr. 12, 131).[1] The Commissioner denied her claim. (Tr. 104-05). McLaurin then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on February 24, 2014, before ALJ Jerome Blum. (Tr. 29-50). McLaurin testified at the hearing without the aid of counsel; Vocational Expert ("VE") Elizabeth Pazowsky also testified. (*Id*.). On April 18, 2014, the ALJ found McLaurin not disabled. (Tr. 9-23). On September 24, 2015, the Appeals Council denied review. (Tr. 1-3). McLaurin filed for judicial review of that final decision on November 5, 2015. (Doc. 1).

**B.     Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it

---

[1] McLaurin also applied for DIB and SSI benefits in 2008, and was denied on January 7, 2010. (Tr. 67-78). The ALJ in the present application for benefits recognized this prior denial, but found that McLaurin's more recent medical records demonstrated that she suffered from additional limitations not provided for in the prior ALJ's decision. (Tr. 16). No error can be found here, and no further analysis of McLaurin's prior application is necessary.

2

is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.    ALJ Findings**

Following the five-step sequential analysis, the ALJ found McLaurin not disabled under the Act. (Tr. 20). The ALJ found at Step One that McLaurin had not engaged in substantial gainful activity following the alleged onset date, May August 1, 2006. (Tr. 14). At Step Two, the ALJ concluded that McLaurin had the following severe impairments: "depression and personality disorder." (*Id*.). At Step Three, the ALJ found that McLaurin's combination of impairments did not meet or equal one of the listed impairments. (*Id*.). The ALJ then found that McLaurin had the residual functional capacity ("RFC") to perform work at all exertional levels, with additional limitations as follows:

> Limited to unskilled jobs as defined in the Dictionary of Occupational Titles with specific vocational preparation levels of one or two with simple, routine tasks. The claimant must not have more than minimum contact with the public.

(Tr. 15-19). At Step Four, the ALJ found that transferability of job skills was not material to determination of her disability status. (Tr. 19). At Step Five, the ALJ concluded that McLaurin retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 19-20).

**E.    Administrative Record**

**1.    Degree of Review in Non-Briefed Social Security Cases**

McLaurin is proceeding *pro se* in this matter, and has not filed a brief in support of her motion for summary judgment. McLaurin instead merely requests "to have another judge haring to review case of SSI or disability review," states that she is "continuing to see physician Galecki," and that she feels she "didn't have a fair hearing no disrespect to any judge just my opinion." (Doc. 19). McLaurin has thus provided no arguments in support of remand, leaving the Court with little guidance as to why she believes remand is appropriate.

Some judges in this district have found that a "plaintiff in a Social Security disability benefits case . . . has no burden to do anything in order to obtain judicial review of the administrative decision except file a timely complaint." *Wright v. Comm'r of Soc. Sec.*, No. 09-CV-15014, 2010 WL 5420990, at *1 (E.D. Mich. Dec. 27, 2010). *Wright* looked to 42 U.S.C. § 405(g), which provides that "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remand." *Id.* at *2. Citing a Northern District of Ohio decision issued in 1983, *Wright* concluded that "[o]nce the complaint and a copy of the record are filed, the Court has before it all that is necessary to enter a judgment on the merits." *Id.* (citing *Kenney v. Heckler*, 577 F. Supp. 214 (N.D. Ohio 1983)).

Yet *Wright* did not establish whether courts ought to apply a circumscribed form of review. Courts must liberally construe arguments raised by *pro se* litigants, but "[l]iberal construction does not require a court to conjure allegations on a litigant's behalf." *Erwin v. Edwards*, 22 F. App'x 579, 580 (6th Cir. 2001); *see also Wells v. Brown*, 891 F.2d 591,

6

594 (6th Cir. 1989) ("Neither [the Supreme] Court nor other courts . . . have been willing to abrogate basic pleading essentials in *pro se* suits.").

It would be entirely inappropriate for the Court to provide the same level of analysis to Social Security benefits claimants who do provide briefs in support of their claims and those who do not. That practice would turn the adversarial judicial system on its head, converting the courts into an advocate for claimants and opponent to the Commissioner, thereby compromising the Court's role as impartial adjudicator. Moreover, such a practice would undermine the important role played by Social Security benefits attorneys, who discover meritorious claims for remand and present them to the courts. Granting exhaustive review to non-briefed claims for remand would also vitiate the waiver principle, which provides that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Anthony v. Astrue*, 266 F. App'x 451, 458 (6th Cir. 2008) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)); *Moody v. Astrue*, No. 2:10-CV-0084, 2011 WL 335863, at *1 (S.D. Ohio Jan. 31, 2011) ("[T]he failure to file a brief at all is a waiver of any issue which might require reversal of the administrative decision.").

Providing exhaustive review to non-briefed claims would also create a perverse incentive for Social Security claimants to abstain from arguing in support of their claim. It would prove difficult for disability advocates to compete with a free, court-as-advocate service, given that a judge knows best what sort of arguments he or she finds most

persuasive. Should the knowledge of this practice become widespread, Social Security benefits appeals would become increasingly taxing on the courts.

The Sixth Circuit has not opined on the degree of review due to non-briefed benefits claims, but there is precedent for reversing the Commissioner's decisions where they are grossly deficient, even where the claimant fails to raise the issue prompting remand. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) ("Admittedly, Reynolds did not raise this specific objection to the decision below, and generally arguments not raised are abandoned. However, this rule is prudential and not jurisdictional . . . and the requirement for specific objections may be excused in the interest of justice.") (quotation omitted); *Carson v. Barnhart*, 140 F. App'x 29, 39 (10th Cir. 2005) ("Ordinarily, we will not consider an argument raised for the first time on appeal . . . . This rule is not without exceptions, however, and in unusual circumstances we will exercise our discretion to consider an argument not raised in the district court . . . . The argument Mr. Carson raises is purely a legal one, and its resolution is clear."); *Truesdale v. Colvin*, No. CIV-12-1307-HE, 2014 WL 549377, at *4 (W.D. Okla. Feb. 11, 2014) (remanding "in the interests of justice" based on an argument that the claimant did not raise).

Some judges in this district have concluded that review of a non-briefed benefits claim should be limited to identifying "obvious errors" in the Commissioner's decision. *Crist v. Comm'r of Soc. Sec.*, No. 13-CV-14008, 2014 WL 2931412, at *2 (E.D. Mich. June 27, 2014) (Michelson, J.). The Commissioner's failure to obtain an expert medical opinion on whether the claimant's physical impairments equal a listed impairment has

8

frequently been found to constitute an obvious error requiring remand. *See id.*; *Ostrander v. Comm'r of Soc. Sec.*, No. 14-13151, 2016 WL 2754906, at *3 (E.D. Mich. Apr. 5, 2016); *Brown v. Comm'r of Soc. Sec.*, No. 12-14057, 2014 WL 222760, at *13 (E.D. Mich. Jan. 21, 2014). One decision suggested that an error is "obvious" when it is "impossible to determine whether substantial evidence supports the ALJ's analysis without th[at] analysis," thus "a Plaintiff cannot waive . . . by not raising" an argument relating to the ALJ's failure to determine whether the claimant met a listing. *Beden v. Comm'r of Soc. Sec.*, No. 214CV14727MAGPTM, 2015 WL 5965006, at *12 (E.D. Mich. Sept. 18, 2015) report and recommendation adopted, No. CV14-CV-14727, 2015 WL 5936324 (E.D. Mich. Oct. 13, 2015).

The precise method for reviewing non-briefed Social Security appeals remains to be determined by the Sixth Circuit, but for the time being the "obvious error" standard provides sufficient guidance to review the instant matter.

### 2.    Medical Evidence

McLaurin does not assert that she suffers from any severe impairments of a physical nature (Tr. 36), thus the Court's review is limited to her mental impairments.

McLaurin has not provided any arguments in favor of remand, and has not directed the Court's attention to any portion of the medical record which might favor her disability claim. Rather than reproduce her medical records in full, which would be both unhelpful and unnecessarily duplicative, the Court will endeavor to call out notable portions of her treatment records in an attempt to identify any obvious causes for remand.

As discussed by the ALJ, McLaurin has undergone treatment for mental issues since at least 2007. (Tr. 16). Global Assessment Function ("GAF") scores provide a snapshot of a patient's mental wellness. While GAF scores do not directly correlate to mental wellness, and cannot be used as the sole basis for a finding of disability or non-disability, *see Rutter v. Commissioner of Soc. Sec.*, No. 95-1581, 1996 WL 397424 at *2 (6th Cir. July 15, 1996), they nevertheless provide some insight into a claimant's mental wellbeing, and are particularly useful when considering mental wellness over a long period of time, *see* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR), (4th ed., text rev., 2000), p. 32 (GAF scores "may be particularly useful in tracking the clinical progress of individuals in global terms").

McLaurin's GAF scores show general improvement over time. In 2008 and 2009 her GAF score was assessed on four different occasions at 50, 45-50, 51, and 50. (Tr. 206, 250, 253, 256). In 2010 she was found to have GAF scores of 55, 50, 50 60, and 63. (Tr. 263, 266, 273, 277, 292). In 2011 those scores were assessed at 62, 62, 65, 65, and 50. (Tr. 300, 324-26, 331). In 2012 and 2013 her scores were 57, 55, 54, 55-60, and 57. (Tr. 297, 309, 312, 314, 335).[2]

---

[2] According to the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), a GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed., 2013) [hereinafter DSM–IV]. A GAF score of fifty-one to sixty indicates, "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. A GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia)" or "some difficulty in social, occupational, or school functioning ... but generally functioning pretty well." DSM-IV at 34.

Throughout her medical records, McLaurin was found to have normal hygiene and grooming, was cooperative with her physician, showed no psychomotor agitation or retardation, spoke in a normal rate, tone, and volume, denied hallucinations, had goal-directed and logical thought processes, and evinced no homicidal or suicidal intent or ideation. (*See, e.g.*, 207, 241, 244, 249, 253, 270, 316, 336).

In 2008 McLaurin initially presented to a crisis clinic reporting depression, anxiety, and loneliness. (Tr. 243). She also described emotional outbursts, and sensitivity to comments made by others. (*Id*.). She spoke to imaginary friends when suffering from stress, but denied paranoid delusions. (*Id*.). She reported disliking being "around people in general." (Tr. 244). She described once putting a manager's hand in hot fry oil in anger. (Tr. 258). She was diagnosed with borderline personality disorder and psychosis. (Tr. 261).

In February 2008 she reported depression and anxiety, including a twenty-year-long feeling of isolation. (Tr. 255). McLaurin asserted that she felt used by others, described transient psychotic symptoms including hearing voices, and stated that she became tearful occasionally, sometimes as often as daily. (*Id*.).

In June 2008 McLaurin reported feeling "much better" thanks to the use of Propanol. (Tr. 239). She was having less trouble working with others, and was less angry. (*Id*.).

In August 2008 her mood was "extremely unstable," starting in a guarded fashion and ultimately becoming friendlier. (Tr. 249). Her insight and judgment seemed limited, and she expressed fleeting paranoid ideations. (*Id*.).

11

In November 2008 McLaurin reported stable mood, with only one incident of becoming irritable while awaiting a phone call regarding an interview. (Tr. 240).

In November 2009 McLaurin was "doing very well with the continuing stressor of being unemployed." (Tr. 206). She was "studying to be a Jehovah's Witness," and was getting along better with others. (*Id.*). Medications were "really helping and have really helped her with her impulsivity and insomnia." (*Id.*).

In December 2009 McLaurin was sleeping during the day, which interrupted her sleep at night. (Tr. 205). She reported feeling irritable around others, but interacted normally with her physician. (*Id.*). GAF of 50. (*Id.*).

In January 2010 McLaurin stated that she was having "a lot of problems in her life," but did not wish to discuss them with her physician. (Tr. 204). She expressed difficulty getting close to others. (*Id.*).

In early February 2010 McLaurin reported "fewer depressive symptoms . . . such as crying spells," but was "still isolating herself." (Tr. 203). GAF of 50. (*Id.*). In mid-February 2010 McLaurin described having "no energy," staying home and self-isolating, and shying away from conversation. (Tr. 202). She was well dressed, had good hygiene and grooming, and was cooperative and pleasant. (*Id.*).

In March 2010 McLaurin was "feeling down but not as bad as she was feeling." (Tr. 201). She described a verbal altercation with a woman at a store, seemingly prompted by feelings of being watched which generated anxiousness. (*Id.*). She had low levels of energy

and tended to self-isolate. (*Id*.). She was "superficially cooperative and pleasant," and her thought processes were logical and goal-directed. (*Id*.).

McLaurin regularly reported difficulty sleeping throughout 2008 and 2009. (*See, e.g.*, 208, 209, 239). In October 2009 McLaurin was "doing very well with some slight stressors." (Tr. 207). However, she was sleeping only two hours nightly. (*Id*.).

In June 2010 McLaurin reported feeling somewhat more upbeat, but felt stress regarding her financial situation. (Tr. 277).

In July 2010 McLaurin stated that her mood was "1/10," with one representing "the worst mood ever." (Tr. 291). She endorsed "hopeless ideations without delusional quality." (Tr. 292). McLaurin denied hallucinations, and had limited insight, but her mental status was otherwise nominal. (*Id*.). Her physician's assessment was that McLaurin displayed "exaggerated symptoms of depression and anxiety," and that she was "presenting herself better as compared with the available history based on records." (Tr. 292). It was noted that McLaurin might need "time to develop appropriate report [sic] to allow herself to express genuine feelings." (*Id*.). Dr. Jan Taliga found that "[b]ased on gathered history, it would be difficult to conclude that the patient has borderline personality disorder," but nevertheless found that McLaurin's psychiatric records seem "highly suggestive that the patient suffers primarily from Axis II disorder." (*Id*.). Given that Axis II deals with personality disorders, *see McAlister v. Liberty Life Assur. Co. of Boston*, 647 F. App'x 539, 543 fn. 5 (6th Cir. 2016), Dr. Taglia's meaning is somewhat unclear, however it appears that he may have

13

doubted whether McLaurin suffered from a personality disorder despite medical records which suggested that condition.

In September 2010 McLaurin expressed significant stress regarding her lack of wealth and a stable home. (Tr. 273). She experienced the urge to curse at others. (*Id*.).

In October 2010 McLaurin reported anxiety when she spent time outside for fear that others were looking at her and judging her. (Tr. 270).

In November 2010 McLaurin expressed a desire to retrain as a medical aid, but was irritable and reported persistent suspicion of others. (Tr. 268).

In December 2010 McLaurin was found to be sleeping better despite discontinuing use of a sleep medication. (Tr. 264). She was "stable," with "decreased irritability," and had "more hope for the future." (*Id*.).

In January 2011 McLaurin was "stressed out by starting her school as a dietitian technician," but had "no other concerns." (Tr. 331). She was "pleasantly surprised from being calm among multiple people at the first day at college and handled well . . . patiently waiting in long lines for books. (*Id*.).

In March 2011 McLaurin was "overwhelmed with wok [sic] load at college and has difficulties to 'pick up on the material.'" (Tr. 328). Later in March 2011 McLaurin was "feeling good again," but "did not follow through with [college] for past 2 weeks and works on changing classes as she felt overloaded with school work." (Tr. 327). She denied crying spells or suspiciousness of others. (*Id*.).

14

In April 2011 McLaurin reported "[g]radually improving anxiety." (Tr. 325). She was "even more relaxed and in good spirits, mood 9/10)." (*Id*.).

In August 2011 McLaurin reported suffering from "crying spells and panic attacks for the last 1 month." (Tr. 299). She had difficulty maintaining her mood, and "lost some friends due to this." (*Id*.). She rated her mood at "4/10." (Tr. 300). Also in August 2011, she reported feeling "better," with improving depression, more energy, less irritability, good sleep, and more interactions with others. (Tr. 322).

In October 2011 McLaurin was irritable during her interview with a physician, and took a phone call mid-appointment. (Tr. 321). She calmed "towards the end of the session and apologi[zed]," blaming her behavior on her medication. (*Id*.).

In December 2011 she experienced no crying spells, was motivated, had "better energy, eating and exercising, no suicidal or homicidal ideations." (Tr. 320). Her depressive symptoms were likewise improved. (*Id*.).

In January 2012 McLaurin reported that "the meds have helped her but she is still not there." (Tr. 318). She was free from crying, and her depressive symptoms were better. (*Id*.). Her anxiety "bother[ed] her but she [was] able to cope with it at times." (*Id*.).

In February 2012 McLaurin described "one episode of panic attack when she went out walking on the street and had to take 2 pills of Xanax . . . but other than that she has been doing well." (Tr. 317). She was free from hallucinations and delusions. (*Id*.).

In March and May 2012 McLaurin complained of "irritability but this arises from interactions and no meds are required." (Tr. 315, 316). She was compliant with her

15

medications and was free from episodes of panic attacks. (*Id.*). She "fe[lt] good with Xanax and [did] not feel the need for Paxil." (*Id.*). She was attempting to acquire a temporary job at that time, but her attempts were rebuffed because of self-described irritability. (*Id.*).

In July 2012 McLaurin was found to be "superficially cooperative in the beginning then more cooperative as the interview went on." (Tr. 297). Her mood was described as "okay," and her affect was "mildly irritable, reactive with full range." (*Id.*). It was noted that she "continues to have depressive feelings," and use of an antidepressant of some sort was indicated, though use of Paxil was to be discontinued due to nausea. (*Id.*).

In August 2012 McLaurin was "angry and irritable" following hospitalization for dehydration and alcohol intoxication. (Tr. 312). She attempted to leave the hospital against medical advice. (*Id.*). However, she described her mood as "doing better" during the interview with her physician. (*Id.*).

Also in August 2012 McLaurin was found to be "much more pleasant than for [her] last visit." (Tr. 311). She was "in much better spirits," had good insight, and described her mood as "doing much better." (*Id.*). She was "very involved in becoming a Jehovah's Witness minister at th[at] time." (*Id.*).

In October 2012 McLaurin requested refills of some of her medications, not including her anxiety medication which she felt was ineffective. (Tr. 310). She complained of anxiousness and anger problems "with slight provocation." (*Id.*).

In November 2012 McLaurin expressed concerns regarding "continued problems with mood swings, 'blow ups' at other people she feels she does not have good control

16

over, and irritability that comes and goes." (Tr. 309). However, McLaurin was "able . . . to address sensitive social situations more calmly as of lately [sic]." (*Id*.). McLaurin's mood was "'feeling much better,'" and her mental status was otherwise nominal. (*Id*.).

In March 2013 McLaurin stated that she was getting good sleep plus one nap during the day. (Tr. 336). She felt "[m]uch better and more rested," along with improved mood. (*Id*.). Nevertheless, she experienced some self-esteem issues. *Id*.

In April 2013 McLaurin was in "good spirits" and she "smile[d] and laugh[ed] appropriately during her visit." (Tr. 338). McLaurin reported understanding that "the medications she takes for anxiety and mood cannot 'fix' her and that not all days will be perfect in terms of her mood. She has been becoming more accepting of this concept over time." (*Id*.). Her medications worked "fairly well for her." (*Id*.).

In May 2013 McLaurin reported being under "financial stress," but was otherwise "doing ok." (Tr. 335). McLaurin reported that her medications "work[ed] fairly well for her," and had no problems from side effects." (*Id*.). The physician wrote that McLaurin might benefit from more frequent visits to an outpatient clinic with the goal of addressing her insecurities; McLaurin agreed. (Tr. 336). As to mood, McLaurin stated that she "just lost her enthusiasm." (*Id*.). Her mental status was generally normal. (*Id*.).

In June 2013 McLaurin stated that hot weather made her irritable, that she had some trouble "tolerating people's 'nonsense.'" (Tr. 337). Her medications were working "fairly well," and she had no trouble with side effects. (Tr. 337).

### 3.    Application Reports and Administrative Hearing

17

### a.     McLaurin's Function Report

McLaurin completed a function report on January 15, 2013, in which she asserted that she is unable to work due to mental impairments which make it more difficult to work with and communicate with others. (Tr. 167). She felt "constant paranoia, mood swings, isolation, anxious all the time, depression, crying spells + irritable all the time." (*Id.*). She also reported "snap[ping]" at others, resulting in confrontation. (*Id.*).

McLaurin reported that her days consisted of little more than taking medications, showering, eating, and sitting around. (Tr. 168). She found herself regularly oversleeping and getting too little sleep. (*Id.*). She required reminders regarding appointments, medication, and appearance. (Tr. 168-69). Her family provided her with meals, and she found herself unable to cook due to lack of concentration and energy. (Tr. 169). She could perform some chores, but required encouragement due to frustration, and found that chores often took longer than normal. (*Id.*).

McLaurin spent little time outdoors because she did not "care for being around people much." (Tr. 170). Her family did most of the shopping on her behalf. (*Id.*). She could pay bills, count change, use a checkbook, but required assistance to handle a savings account. (*Id.*). She found that her mental ailments made counting more difficult due to lack of focus. (Tr. 171).

McLaurin reported being fired "many times" for insubordination. (Tr. 173). She handled stress and changes in routine "not well." (*Id.*). She also reported experiencing difficulties around others, phobias, and delusional thoughts. (*Id.*).

18

### b.      Marla McLaurin's Function Report

On January 21, 2013, McLaurin's case manager, Jennifer Jones, completed a third party function report which generally corroborated McLaurin's own function report. (Tr. 175-82).

### c.      McLaurin's Testimony at the Administrative Hearing

At the February 24, 2014, hearing before the ALJ, McLaurin appeared without an attorney or other representative. (Tr. 29-50). After being told of her right to obtain a representative, McLaurin opted to proceed without counsel. (Tr. 31). Notably, the ALJ took pains to explain the system of determining DIB and SSI benefits eligibility in layman's terms, including the appeals process. (Tr. 40-42, 45, 47).

McLaurin told the ALJ that her worst problems were "[c]onfusion" and being "sad all the time." (Tr. 34). She also complained of depression and personality disorder. (Tr. 35). She asserted that she lost prior jobs due to confrontations and insubordination. (Tr. 36).

She asserted that she could not work with other people because she "get[s] paranoid around them," feels that others are "against [her]," and does not "feel comfortable around work. I would just like to have a setting by myself." (Tr. 38).

When asked whether she could perform work as a television surveillance monitor, McLaurin stated that she would not have a problem performing that work. (Tr. 42). She confirmed that it was "the people that present[] the problem," meaning that her ability to work was mainly restricted by her desire to be alone. (Tr. 42-43). She could not, in her

19

estimation, perform work as a gate guard, because she was uncomfortable dealing with others and being "boxed in" to a gatehouse. (Tr. 43). McLaurin also confirmed that she did not regularly go out to malls, movies, or restaurants. (Tr. 42-43).

### d.      The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine McLaurin's ability to perform work. (Tr. 44). The VE testified that approximately 1,000 surveillance monitor positions exist in Michigan. (Tr. 46). The ALJ was "looking for more jobs than this," and thus asked whether there were other sedentary jobs which would "require only minimum contact with the public." (*Id.*). The VE confirmed that several such jobs existed, including approximately 6,000 sorting, packaging, inspection, and assembly jobs in Michigan. (*Id.*). More particularly, those positions included sorter and grinding machine operator. (Tr. 47-48). These positions did not involve any contact with the public, and were not interdependent with other workers, thus workers would not be required to "maintain any relationship" with coworkers. (Tr. 48). Those positions would likewise involve "minimal" contact with superiors, perhaps a "couple times a day." (Tr. 49). However, the VE also noted that if a worker was "always argumentative and [not] responding fully to management and other people in the environment, they're not going to keep her." (*Id.*).

McLaurin had no questions for the VE. (Tr. 49-50).

### F.      Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various

20

categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513.

"Acceptable medical sources" include, among others, licensed physicians and licensed or

certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who

are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.*

§ 404.1513(d). Only "acceptable medical sources" can establish the existence of an

impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-

acceptable sources provide evidence to the Commissioner, often in the form of opinions

"about the nature and severity of an individual's impairment(s), including symptoms,

diagnosis and prognosis, what the individual can still do despite the impairment(s), and

physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such

opinions, the regulations deem the statements to be "medical opinions" subject to a multi-

factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of

"medical opinions" are various decisions reserved to the Commissioner, such as whether

the claimant meets the statutory definition of disability and how to measure his or her RFC.

*Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of

medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at

whether the source examined the claimant, "the length of the treatment relationship and the

frequency of examination, the nature and extent of the treatment relationship,

supportability of the opinion, consistency of the opinion with the record as a whole, and

specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544

(6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Caldwell v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

22

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Caldwell v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p,

23

2:15-cv-13912-GER-PTM   Doc # 22   Filed 12/01/16   Pg 24 of 33   Pg ID 440

1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

As noted above, McLaurin has not submitted a brief in support of her motion for summary judgment, and has presented no arguments in favor of her claim. The Court will thus review the record for obvious errors.

Courts applying the "obvious error" standard have frequently remanded for further proceedings where the ALJ failed to render a proper finding at Step Three. *See, e.g.*, *Crist*, No. 13-CV-14008, 2014 WL 2931412, at *2; *Ostrander*, No. 14-13151, 2016 WL 2754906, at *3; *Brown*, No. 12-14057, 2014 WL 222760, at *13. At Step Three, the ALJ must determine whether the claimant meets or equals an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart B, Appendix 1. The ALJ may determine whether the claimant meets a listing without seeking input from a medical expert, but must seek an

25

expert opinion when determining whether a claimant's conditions medically equal a listed impairment. *See Retka v. Comm'r of Soc. Sec.*, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made.") (citing 20 C.F.R. § 416.926(b)); *Krawczak v. Comm'r of Soc. Sec.*, No. 14-11281, 2016 WL 1178753, at *4 (E.D. Mich. Feb. 26, 2016) ("SSR 96–6p treats equivalence determinations differently from determinations as to whether an impairment meets a listing, requiring expert evidence for the former, but not the latter."), report and recommendation adopted, No. 14-11281, 2016 WL 1170778 (E.D. Mich. Mar. 25, 2016). "This expert opinion requirement can be satisfied by a signature on the Disability Determination Transmittal Form." *Osley v. Comm'r of Soc. Sec.*, No. 12-12279, 2013 WL 3456963, at *10 (E.D. Mich. July 9, 2013).

The Disability Determination Transmittal in this case, dated April 11, 2013, bears the signature of Dr. Zahra Khademian. (Tr. 104, 105). Dr. Khademian specifically considered whether McLaurin met Listing 12.04, which covers affective disorders; he concluded that she did not. (Tr. 86-87). While the ALJ did not explicitly assert in the decision that his Step Three finding was based on Dr. Khademian's report, that physician's signature on the Disability Determination Transmittal is sufficient support for the ALJ's finding. (Tr. 14-15). Remand is thus not appropriate as to the ALJ's Step Three finding.

Having reviewed the most common area of remand in non-briefed cases, I now turn to an overview of the remaining portions of the ALJ's decision. Based on the medical

26

record, the ALJ determined that McLaurin could perform a full range of work with additional restrictions, which is to say that she was:

> Limited to unskilled jobs as defined in the Dictionary of Occupational Titles with specific vocational preparation levels of one or two with simple, routine tasks. The claimant must not have more than minimum contact with the public.

(Tr. 15). This RFC finding properly accommodates McLaurin's mental limitations as supported by the medical record. The ALJ made note of McLaurin's GAF scores across her medical record, which, as detailed above, show fairly consistent improvement in her mental health over several years. During 2008 and 2009 McLaurin's GAF score tended to sit closer to 50 (Tr. 206, 250, 253, 256), but by 2012 and 2013 her scores sat closer to 60 (Tr. 297, 309, 312, 314, 335). While these scores are of limited value, they appear to demonstrate that McLaurin's condition improved slightly over time, and at a minimum did not substantially worsen over the course of her treatment.

Review of the medical records confirms general improvement in McLaurin's mental health over time. Whereas McLaurin reported experiencing paranoid delusions, including hearing voices, in 2008 (*see, e.g.*, Tr. 249, 255), she was generally free from delusions in the latter period of her treatment (*see, e.g.*, Tr. 292, 317).

Her mood was low and sometimes unstable during 2008 through 2010 (*see, e.g.*, 249, 291-92), whereas by 2011 she was more often found in good spirits (Tr. 338), with "mood 9/10" (Tr. 325), often reported "doing better" (Tr. 309, 311, 312). This is not to say

27

that McLaurin's mental ailments have been resolved, and she endorsed difficulty controlling mood swings in 2012. (Tr. 309).

McLaurin's sleep was irregular, interrupted, and unsatisfying in the earlier phases of her treatment. (Tr. 205, 207, 208, 209, 239). Yet by 2010 she more often reported good sleep, even when not using sleep aids. (Tr. 264, 322, 336).

McLaurin tried the use of several medications throughout her treatment period, with varying results. In 2011 she found that one medication caused emotional outbursts (Tr. 321), but in 2012 reported that her medications left her free from panic attacks (Tr. 315-16), reported that her medications worked "fairly well" (Tr. 335, 338), and reported no side effects. (Tr. 337).

McLaurin doubtlessly suffers from certain mental conditions which restrict her ability to interact with others in a customary fashion. The ALJ properly noted McLaurin's complaints of irritability, paranoia, distrust, moodiness, and poor impulse control in her function report (Tr. 18), her alleged history of job loss due to difficulty cooperating with employers (*Id.*), and medical records indicating that she had substantial problems with irritability and anxiety (Tr. 16-18). The ALJ thus reasonably concluded that McLaurin's conditions have been improved with treatment, degrading the credibility of her assertion that treatment has been unhelpful. (Tr. 16).

The ALJ properly accounted for McLaurin's difficulty working with others by limiting the RFC assessment to only "minimum contact with the public." (Tr. 15). Perhaps most convincingly, when asked at the hearing before the ALJ whether she would have

difficulty performing work as a surveillance monitor, which involved little contact with others, she answered "no." (Tr. 42). Further, she answered "yes" when asked whether it was "the people that present[] the problem" preventing her from performing other jobs. (*Id.*).

The ALJ amply compensated for this difficulty interacting with others by including in the RFC a limitation to "minimum contact with the public." (Tr. 15). In consideration of the medical record and McLaurin's own subjective reports, there is no reason to believe that this accommodation would insufficiently account for McLaurin's difficulties interacting with others. Moreover, McLaurin explicitly admitted that she would not have difficulty working as a surveillance monitor due to the limited contact with the public required by that position. (Tr. 42). McLaurin is to be commended for this honest assessment of her condition. Finally, McLaurin's failure to raise an argument regarding her difficulty working with others waives that argument. *See Anthony*, 266 F. App'x at 458. McLaurin's *pro se* status does not entitle her to a court-as-advocate review of all potential claims, and there is no reason to believe that an error regarding a claimant's difficulty working around others is so obvious that it would merit remand *sua sponte*.

McLaurin also alleged in her function report that she had some difficulty performing tasks due to concentration deficits.  (Tr. 169, 171). The ALJ accounted for this alleged limitation by restricting the RFC assessment to "unskilled jobs . . . with specific vocational preparation levels of one or two with simple, routine tasks." (Tr. 15). The ALJ concluded

that McLaurin suffered from "moderate" limitations to concentration, persistence, or pace ("CPP"). (Tr. 15).

Were she represented by counsel, McLaurin might have argued that her concentration deficits preclude her successful completion of the jobs identified by the VE: surveillance monitor and bench-type jobs like sorter, packager, and inspector. (Tr. 20). Claimants frequently argue that limitations like "unskilled" and "simple" do not account for moderate CPP limitations, and courts have resolved the issue both ways. *See Hernandez v. Comm'r of Soc. Sec.*, No. 10–cv–14364, 2011 WL 4407225, at *9 (E.D. Mich. Aug. 30, 2011) (collecting cases). Courts in this district have noted that even simple, unskilled, routine jobs often require meeting quotas, alertness, or consistent pace. *See Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005); *see also Teal v. Comm'r of Soc. Sec.*, No. 10-13154, 2011 WL 4484910, at *3 (E.D. Mich. July 12, 2011) (noting that surveillance monitor and visual inspector positions "require a high degree of sustained concentration"), report and recommendation adopted, No. 10-13154, 2011 WL 4484864 (E.D. Mich. Sept. 26, 2011).

Ultimately, courts must look to "the record as a whole" to determine whether the restrictions included by the ALJ in the RFC assessment are sufficient to account for the claimant's moderate CPP limitations. *Hernandez*, No. 10–cv–14364, 2011 WL 4407225, at *9. In this case, McLaurin complains in her function report of substantial concentration issues which prevent her from completing certain tasks. (Tr. 169, 171).

Review of McLaurin's medical records demonstrates that she suffered from mood swings, irritability, paranoia, and anxiety in varying degrees over the course of her treatment. Yet the focus of McLaurin's treatment was her interactions with others, with precious few complaints regarding an inability to complete tasks when unburdened by the presence of others. (*See, e.g.*, Tr. 244 (describing disliking being "around people in general"); Tr. 240 (irritability arose when waiting for a phone call regarding an interview); Tr. 201 (describing a verbal altercation at a store); Tr. 273 (urge to curse at others); Tr. 270 (fear of being around others); Tr. 315-16 (irritability appeared to result from inter-personal relations); Tr. 337 (reporting some difficulty dealing with other peoples' "nonsense"). Based on the medical record, there is no reason to believe that McLaurin would be unable to complete work that is unskilled, involves only simple, routine tasks, and has a specific vocational preparation level of one or two. No error can be found here.

McLaurin comes closest to raising an argument in her motion for summary judgment where she asserts that she "didn't have a fair hearing." (Doc. 19 at 2). McLaurin gives no indication why she believes her hearing before the ALJ was not fair, and review of the transcript from the 2014 hearing before ALJ Jerome Blum demonstrates the inverse. ALJ Blum made a substantial and commendable effort to inform McLaurin of her rights, the legal functioning of the Social Security disability system, and the procedure underlying the appeals process. (Tr. 40-42, 45, 47). Quite apart from being unfair, ALJ Blum's efforts serve as a model for other ALJs on how to conduct a thorough, clear, respectful hearing

31

with a Social Security claimant who proceeds without counsel. The decision of the ALJ is supported by substantial evidence, and should be upheld.

### H.   Conclusion

For the reasons stated above, the Court **RECOMMENDS** that McLaurin's Motion for Summary Judgment (Doc. 19) be **DENIED**, the Commissioner's Motion (Doc. 20) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Caldwell v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

32

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 1, 2016                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 1, 2016                    By s/Kristen Castaneda
                                          Case Manager

33